Withers, J.
dissenting. — Two questions are presented by this, case : 1. Was the charge on c.ircuit right as to the description and quantity of tools of trade which are exempt from levy and sale by the Act df 1823 7 . 2. If so, still was the defendant liable for the conduct of his bailiff in seizing such tools as are exempt by law 7
*368 1. There is much difficulty in prescribing a fixed rule in regar¿ to what are tools of trade, what kind of tools are exempt, and perhaps who shall be deemed a mechanic. When j say w¡iat ]cjnd 0f tools, I contemplate a case where one may have a vast quantity and variety of tools, or implements that tradesmen use, and yet he may use them very rarely. The leading object of the Act certainly is, to save the mechanic from the sudden -suspension of that daily business whereby he is accustomed to support his family. But That very idea seems to me to exclude such tools as are used occasionally only; and certainly such as a mechanic may have for the purpose of testing theoretical views, for example, in the application of certain laws of nature, which men of genius-endeavor to'subject to practical utility. Hew.ever useful -may be the result, occasionally, to the civilized world, of such mechanical labors, it is scarcely' probable that the Legislature contemplated, in the Act of 1823, that such exercises were useful in the immediate support of a family ; and, therefore, I cannot read the Act of that year in such manner as ■to sweep under its shelter whatever may be a tool, and may be also in the possession of , a mechanic, irrespective of the enquiry whether it be one in constant use in pursuit of a daily avocation in nature of a trade, and that, too, connected with the purpose of earning the maintenance of himself and his dependants. I have no idea that the Act. of 1823, in relation to this enquiry, ever designed the grand purpose of building up, of encouraging and enlarging, the important interest of mechanical pursuits — for the provision in question is found in a connection that forbids such conjecture; and certainly all will agree that, if such was the -design, the feeblest scheme was devised that could well be conceived. We might as properly say, that the simple exemption of a plough-share, a rake, a hoe, &c. from levy and sale, was designed to build, encourage, and' magnify the still greater interest of agriculture. While I might agree that the Legislative power could not concern itself about objects of weightier moment to the general interest, I would carefully abstain, even if I looked only to the advancement of those interests, from attempting such magnificent enterprizes by means so inadequate as we find in the Act in question. Even if there were in it inherent vigor enough for such ends, still it would presuppose an elasticity to be called forth from time to time by judicial agency not supposed to pertain to the exact capacity and rigid qualities of á statute, however, that convenient attribute may be a boasted characteristic of the common law, which would-seek to rival the atmosphere almost in its universality and beneficent ministrations. The truth seems to be, that we shall err, perhaps unhappily, if we attribute too much virtue to the Act of 1823, or aim at more in the appli *369 •cation of it than to make it subserve the restricted, but very humane and useful end, stamped upon its front — that is, tot save to “ every family,” in an unhappy contingency, some means of temporary support, and the accustomed implements by which those means have been and (it was supposed) are to be earned. I shall not. insist that the Act, in every exemption, looks to the case of a “family,” and not to that of an individual without a family; for though I think a question might be made upon that view, I am quité content to acquiesce in a more enlarged signification, and such I believe has been adopted.
The language of the Act is this: “ And if a mechanic, the tools of his trade” — not his trades. The charge on the cirbuit was, “ that there were kindred employments which might be pursued by the same person ; and in such case, all his tools necessary to carry on these trades might be protected but, (it is. added,) if one should unite a great many different employments, as tailoiy shoemaker, and- blacksmith, then only -the tools of his principal employment should be protected. '
I presume there is more difficulty in administering this law here than there would be in England. Here, one is obliged to serve no apprenticeship to gain the’ position of a mechanic •or tradesman. Indeed, I have known more than one repairer of watches very suddenly to convert himself into a dentist. Here, likewise, owing to our comparative mechanical minority, it is quite usual to blend “ kindred’ employments,” (as they were called on circuit,) and in very many cases it would be extremely difficult to determine which was the individual’s “ trade” — what “ trades” should be considered kindred and what alien to each other; and most difficult of all,. •to pronounce which should be considered- the principal or leading trade. In the instance before us, “his sign was that of a bell-hanger, but he made more by cutting taps to make-screws, than by bell-hanging.” Now, if the jury heeded the charge, as they probably did, these two modes of mechanical employment were regarded as cognate. Where is the link of' affinity between them ? Confessing, as I have done, the difficulty of prescribing a rule that shall be. at once as precise as a legal rule should be, and yet as genial and liberal as I, would have it, still I am not content with the broad terms in. which the subject was submitted tp the jury. I am impressed by considerations such as these, viz: That the scope of' the Act is quite limited; that the exemption is created for .an-emergency ; that it looks to the temporary support of a family by means of daily labor, and in the case of a mechanic, by means of such tools or implements as he did in fact daily use for that purpose, with his bodily powers, in some one definite-trade ; and not to machinery, such as, since 1823, has wholly *370 supplanted very much that was then known as to tools and mechanical powers, which has pushed forward the mechanical arts and trades at a rate never dreamed of then, which is constantly, even during the current hour, so transforming and exalting our ideas on such subjects, that we seem to be surrounded by the creations of magic. Wherefore, such being the limited purpose of the Legislature, conferring a favor which the common law withheld, and inasmuch as the multifarious avocations of the mechanic himself creates the difficulty, it is deemed more conformable to the policy and language of the Act and its safe administration, that the party distrained upon shall be held, on the instant, or within reasonable time, to elect what shall be regarded as his trade; and, therefore, what set of tools he shall retain; or if he will not, that the jury shall be instructed to fix these matters themselves, allowing the tools of one trade only.
2. Upon the question, whether this defendant was liable, even if the bailiff did lake goods that were exempt, I also entertain grave doubt. I do not propose to enter at all into the question as to what form of action should be employed against the principal, where, he being absent, his servant has committed an act of trespass. It may be conceded, (whether the reason assigned for .it be good or bad,) that though the servant may be sued in trespass vi et armis, yet the action against the master should be- case. It will never do to say that a landlord’s liability shall depend on the form of action which a tenant may adopt. We must look for some principle to govern the case. The question here is, can this defendant be held liable at all. without proof of ratification, for the distress that was made in this caáe. i Now, it is to be taken for granted, of course, in discussing this question, (for •that is the very cause of complaint,) that the bailiff seized tools of trade by law exempt. Not only did the law expressly instruct him not to do so, but he was also thus expressly instructed by the defendant. Now, on what principle is the master ever held liable for the servant’s act? Qui facit per alium, facit per se; that is, the presumption of law construes the master to be acting by the hand of his servant. ’ If it be not a presumption ywris et de jure, then it surely may be rebutted. Undoubtedly if such a presumption exists here, it is fully and perfectly rebutted. How can you say that the master was acting through the servant in seizing upon tools, when the master directed the contrary, and both were forbidden to do so by law? The confusion often arises from the difficulty of forgetting, for the moment, the relation of principal and agent; of carving out, as it were, entirely from the course of the agency, such transaction as is wilful and unlawful. Yet, this ought to be done, for quoad hoc the relation of principal and agent does not exist. To charge *371 the master, it must be shewn or presumed that the relation existed between them in the, particular affair ; for if the mas- ( ter be liable under other circumstances, he is not so as master, but as any one would be who instigates an injury. Suppose the bailiff in this case had seized the plaintiff’s hatuprnt his head, would the landlord be held liable-? If you then suppose, in a scuffle to retain it, the bailiff had beat the plaintiff, must the master bé liable for that also 7 If so, and during the scuffle, they had knocked put the glass of a neighbor’s window, the.master must still be held liable. Whoever affirms these propositions must be misled by the idea, that from the commencement of a lawful service to its termination, the relation of landlord and bailiff must necessarily continue, in each and every incident that may chance to grow out of the transaction. Every one is presumed to know ■the law, and if the articles taken on the present occasion were exempt, it must be held that the bailiff knew it. Now suppose Wightman had expressly instructed the bailiff not to •take the identical articles in question, and he nevertheless ■straightway took them, I cannot see the ground on which the landlord should- be held liable. When, however, he gave him the warrant .-and the express instruction to take no tool of trade, and when the law reinforced that instruction, the case is the same, and it is the one before us. It should be observed, that this bailiff was not the defendant’s general agent, but was one both special and limited; special, as confined to one transaction, and limited by instruction in the performance of his duty in that. So the case does not admit that freedom of presumption against the principal which arises from another form of agency.
One shall, indeed, be presumed to intend the ordinary consequences of his own acts; and, therefore, if he employs a servant that is negligent, thoughtless, heedless, it is reasonable to conclude that he knew, or should have known it, and meant to face the hazards and responsibility. But for consequences that are remote or barely possible — for consequences having no natural connection with the act authorized, much more for collateral acts that are unlawful or criminal, it would be violating the plainest principle of presumptive evidence to impute such to the master. If the servant be driving the master’s wagon, and he wilfully drive over another, he is in pursuit of his master’s business, in the general sense; butiro hac vice if he had gone into his own independent business. He would be driving his master’s wagon also, though he were engaged in the purpose of running away with it. lean see no line for attenuated distinctions. The general rule is the intelligible and safe one, that wherever an agent, particularly a special and limited agent, does,a wilful act that is .unlawful, though he may connect it with the cur *372 rent eventsof his agency, or cause it to spring from them, the or principal shall not be presumed to have authorized it, or to be responsible for it; a fortiori shall he not be where the act is forbidden both by himself and the plain letter of the statute law.
What I have said would, of course, leave open every point touching a subsequent ratification, and all liability to refund ex equo et bono money improperly received and retained. I conclude, therefore, there should be a new trial, with a view, at any rate, to a more restricted doctrine as to the range of exemption that shall be imputed to the Act of 18-23. I have written thus much, as well with the hope of inducing caution hereafter on this important subject, as for the purpose of assigning a reason for venturing to differ from a majority of the Court.
O’Neall, J. concurred.